UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Shannon Hollie,

             Plaintiff,              Court File No. 22-cv-314 (KMM/LIB)

v.

                                   **REPORT AND RECOMMENDATION**

Essentia Health Moose Lake Clinic, et al.,

             Defendants.

This matter comes before the undersigned United States Magistrate Judge, pursuant to a general referral made in accordance with the provisions of 28 U.S.C. § 636, upon Defendant Benjamin Marsh's Motion for Summary Judgment, [Docket No. 100], and Defendant Essentia Health Moose Lake Clinic's Motion for Summary Judgment. [Docket No. 108]. On June 2, 2023, the Court took Defendants' Motions for Summary Judgment under advisement upon the parties' written submissions. (Order, [Docket No. 117]).

For the reasons set forth below, the Court recommends that Defendant Marsh's Motion for Summary Judgment, [Docket No. 100], be **GRANTED**, and Defendant Essentia Health Moose Lake Clinic's Motion for Summary Judgment, [Docket No. 108], be **GRANTED**.

**I.**      **Background**

The following facts are not in dispute: Since 2009, Plaintiff Shannon Hollie (hereinafter "Plaintiff") has been a patient civilly committed to the Minnesota Sex Offender Program ("MSOP") in Moose Lake, Minnesota. (Complaint, [Docket No. 1], at ¶¶ 10, 16; Transcript from the January 10, 2023, Deposition of Plaintiff ("Pl. Dep."), Exhibit A to the Declaration of Tracy A. Schramm ("Schramm Decl."), [Docket No. 103], at 3:11-3:16). His release date from the

1

program has not yet been determined. (Id. at 53:21-54:12). As an MSOP patient, Plaintiff receives routine medical care from MSOP medical providers and is referred to non-MSOP medical providers for medical treatment not otherwise available within the program.[1] (Id. at 112:16-24).

In October 2017, Plaintiff was diagnosed with prostate cancer. (Id. at 21:14-16). At some point thereafter, Plaintiff consulted with urologist Dr. Thomas Stillwell where prostate cancer treatment and side effects were discussed, including radiation and surgical options. (Id. at 74:1-75:11). Plaintiff elected to move forward with surgery, and in October 2018, he underwent a prostatectomy procedure with Dr. Stillwell. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 21:17-19). Following the procedure, Plaintiff was healing well, but he was reportedly experiencing erectile dysfunction. (Id. at 75:18-76:13; Exhibit D to Schramm Decl., [Docket No. 104-3], at p. 2). Dr. Stillwell ultimately passed away before Plaintiff could discuss with him the available options to treat his erectile dysfunction. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 75:18-76:13).

Shortly thereafter, Plaintiff's urology care was transferred to Defendant Dr. Benjamin Marsh. (Id. at 75:24-76:13). Dr. Marsh is a urologist employed by The Duluth Clinic, Ltd. (Decl. of Kristin Olson ("Olson Decl."), [Docket No. 112], at ¶ 4).

In September 2019, Plaintiff was seen by Dr. Marsh at the Essentia Health Moose Lake Clinic ("Essentia") with elevated prostate-specific antigen ("PsA") levels. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 41:12-20; Exhibit B to Schramm Decl., [Docket No. 104-1], at p. 3. As a result, Dr. Marsh referred Plaintiff to radiation oncologist Dr. Kenneth Dornfield for

---

[1] Further, all treatment or medical procedures from non-MSOP medical providers must be scheduled through and approved by MSOP Health Services. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 70:13-19, 72:18-73:6, 118:2-19). To determine whether certain treatments or procedures are permissible within the program, an MSOP client would first inquire with the MSOP's facilitator physician, who oversees medical procedures. (Id. at 119:1-10).

2

consideration of salvage radiation therapy. (Ex. B to the Schramm Decl., [Docket No. 104-1], at p. 3; Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 41:12-42:2).

After completing radiation therapy in January 2020, Plaintiff was informed by Dr. Dornfield that being sexually active after treatment was possible but "would take some time" to ensure that he was healing from treatment and that the cancer would not return, at which time he would then refer Plaintiff back to Dr. Marsh for urology treatment. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 42:3-11). In March 2020, Dr. Marsh confirmed that Plaintiff's options for erectile dysfunction treatment would be discussed once all follow-up cancer treatment was completed. (Id. at 42:12-18).

Approximately fifteen months later, in June 2021, Plaintiff began reporting to the medical staff at the MSOP Health Services Department that he was having difficulty emptying his bladder, experiencing incontinence and blood in his urine, and developing a rash. (Id. at 77:1-19; see also Exhibit B to Schramm Decl., [Docket No. 104-1], at p. 3). Plaintiff also reported these side effects to Dr. Marsh on June 28, 2021. (Exhibit B to Schramm Decl., [Docket No. 104-1], at pp. 2-3). As a result, Dr. Marsh scheduled Plaintiff for a diagnostic cystoscopy to evaluate the possibility of a bladder neck contracture or stricture or radiation cystitis. (Id. at p. 3).

At some point during a follow-up appointment, Dr. Marsh also discussed with Plaintiff three treatment options for his erectile dysfunction: Viagra in a pill form, Viagra in a liquid form, and a penile implant. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 26:4-27:2). Dr. Marsh demonstrated how the implant would operate, and he stated that Plaintiff's medical insurance would cover the procedure. (Id. at 27:3-8). Plaintiff expressed his interest in moving forward with the penile implant, and Dr. Marsh indicated that he would "look into setting up the surgery." (Id.).

On August 9, 2021, Plaintiff underwent a cystoscopy procedure with Dr. Marsh. (Pl. Dep., Exhibit C ("Ex. C") to the Schramm Decl., [Docket No. 104-2], at p. 3). After the procedure, Plaintiff inquired once more about the penile implant. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 27:9-17). Dr. Marsh confirmed that Plaintiff was a candidate for the penile implant and that his medical insurance would cover the procedure; however, Dr. Marsh advised Plaintiff that he "may want to get a different urologist" because he was not comfortable performing the penile implant for Plaintiff due to his history of being a sex offender. (Id. at 27:18-25, 62:15-63:2; Ex. C to the Schramm Decl., [Docket No. 103], at p. 4). Plaintiff asked Dr. Marsh, "[W]hat can I do about it?" and Dr. Marsh responded that he could raise his concerns with the "ethics committee." (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 28:8-11). Plaintiff was then told to return to Essentia in six months for a PsA follow-up appointment. (Ex. C to the Schramm Decl., [Docket No. 103], at pp. 1, 4).

As scheduled, Plaintiff saw Dr. Marsh for his PsA follow-up appointment in October 2021, where he reported no issues with his urine stream, but continued to express his interest in the penile implant. (Exhibit D to the Schramm Decl., [Docket No. 104-3], at p. 2). During this same time, Plaintiff also began receiving treatment for his diabetes with Dr. Randy Rice at the Gateway Family Health Care in Moose Lake, Minnesota, at which time Plaintiff asked for a referral to a different urologist. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 33:5-24, 34:7-12, 40:1-3). Dr. Rice referred Plaintiff to a urologist in St. Luke's Hospital, "Dr. Johnson." (Id. at 34:14-17).

In late November 2021, having not heard from the ethics committee, Plaintiff and Client Rights Coordinator Donna Ennis called Essentia to inquire about the status of the ethics committee review. (Id. at 28:12-22, 100:18-101:6, 106:3-5). When Plaintiff received a call back that same

4

day, he was informed that "Essentia could not compel their physicians to do a surgery" and that "[i]f [Plaintiff] want[ed] to pursue this [issue] any further, he [would] ha[ve] to deal with [Essentia's] legal team." (Id. at 28:25-29:8, 105:5-18).

Plaintiff began placing requests for a new urologist through MSOP Health Services where he was directed to follow the client requested non-MSOP health care policy. (Id. at 38:19-39:18, 43:11-21). In April 2022, Plaintiff placed a request for a "six-month PSA follow-up with the urologist," but a registered nurse at the MSOP responded that scheduling his urology appointment was becoming difficult "due to pending litigation between [Plaintiff] and the urologist," and that she was waiting to hear from "Essentia Urology" as to whether Plaintiff would be seen by another urologist or whether "we [would] need to find a different one." (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 46:19-47:1). In May 2022, Plaintiff then filed a Client Medical Request Form, requesting a different urologist. (Id. at 48:4-14). In response, an MSOP staff member provided that when the time came for his six-month PsA follow-up, Plaintiff would have the option of choosing whether or not to see the assigned urologist. (Id. at 48:15-49:17).

In November 2022, Plaintiff eventually saw "Dr. Johnson" at St. Luke's Hospital for his urology needs. (Id. at 35:11-36:2, 45:17-22, 47:2-10). Plaintiff did not discuss with Dr. Johnson his erectile dysfunction and available treatment options. (Id. at 36:5-10, 69:9-20). However, Plaintiff is considering alternatives for the penile implant through the Veteran's Administration and has completed preliminary paperwork. (Pl. Dep., Ex. A to the Schramm Decl., [Docket No. 103], at 37:12-25).

Plaintiff ultimately commenced this action against Defendants Dr. Marsh and Essentia, alleging that they discriminated against him as a class of one and failed to provide him with adequate treatment for his serious medical needs when they refused to provide him with a penile

5

implant needed to treat his erectile dysfunction solely based on his sex offender status. (Complaint, [Docket No. 1], at ¶ 1). Plaintiff also asserts that Dr. Marsh unlawfully altered or falsified his medical records for these same reasons. (Id. at ¶ 2(a)). As such, Plaintiff alleges that Defendants violated of his right to due process of law and his right to equal protection under the United States Constitution and Minnesota Constitution; violated Titles II and III of the Americans with Disabilities Act ("ADA"); and violated the Rehabilitation Act, the Minnesota Health Records Act, and Minn. Stat. § 541.076.1. (Id. at ¶¶ 36-40).

**II.     Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

The moving party bears the burden of offering sufficient admissible evidence to establish that there are no genuine issues of material fact, and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When deciding a motion for summary judgment, a court views the evidence before it in the light most favorable to the nonmoving party and all reasonable inferences that may be drawn from the underlying facts in the record must be drawn in the favor of the nonmoving party. Ludwig v. Anderson, 54 FG.3d 465, 470 (8th Cir. 1995); Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991). However, the "facts must be viewed in the light most favorable to the

nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

"Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 526–27 (8th Cir. 2007). While the burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, the nonmoving party may not rest on mere allegations or denials in their pleadings, but the non-moving party must set forth specific admissible evidence-based facts showing the existence of a genuine issue. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002). "A properly supported motion for summary judgment is not defeated by self-serving affidavits." Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cnty. Med. Ctr., 550 F.3d 711, 716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Id. at 473-74. "If the moving party supports the motion with evidence, the opposing [non-moving] party must rebut it, or the court can consider the fact undisputed." Irish v. U.S. Dept. of Justice, Civ. No. 11-2703 (MJD/JJK), 2013 WL 451314, at *2 (D. Minn. Jan. 3, 2013) (citing Fed. R. Civ. P. 56(e)(2)), report and recommendation adopted by 2013 WL 452576, rev'd on other grounds, 564 Fed. App'x 259 (8th Cir. 2014).

In addition, a movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Under such circumstances, no genuine issue of fact exists because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. If the nonmoving party relies on conclusory allegations and fails to present evidence

7

supporting a necessary element of a claim, then that claim cannot survive summary judgment. Beyer v. Firstar Bank, N.A., 447 F.3d 1106, 1108 (8th Cir. 2006).

While the Court is required to construe the content within Plaintiff's pleadings liberally as he is proceeding pro se, Plaintiff is nevertheless bound by all applicable procedural and substantive law. See Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004); Farnsworth v. City of Kansas City, Mo., 863 F.2d 33, 34 (8th Cir. 1988) ("Pro se litigants are not excused from complying with court orders or substantive and procedural law." ); Burgs v. Sissel, 745 F.2d 526, 528 (8th Cir. 1984) ("Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law."). The claims of a plaintiff, even a pro se plaintiff, cannot survive a motion for summary judgment unless the plaintiff has set forth specific admissible facts demonstrating that there is a genuine issue for trial. See Quam v. Minnehaha Cnty. Jail, 821 F.2d 522, 522 (8th Cir. 1987).

### III.    Analysis

As stated above, Plaintiff brings claims against Defendants under 42 U.S.C. § 1983, asserting that they violated his constitutional rights under the Eighth and Fourteenth Amendments by being deliberate indifferent to his serious medical needs and for discriminating against him based on his status as a committed sex offender. Plaintiff also brings claims under 42 U.S.C. § 1981, Titles II and III of the ADA, as well as, several state law claims.

Defendant Dr. Benjamin Marsh asks the Court to rule in his favor on summary judgment on the basis that no genuine dispute exists as to any material fact regarding Plaintiff's claims of deliberate indifference and equal protection, among other bases. (Def. Marsh's Mem., [Docket 102], at pp. 15-41). Essentia Health agrees with Dr. Marsh's arguments, but it also asks the Court to rule in its favor on summary judgment because, although it is named in this action presumably

8

as Dr. Marsh's employer, it is in fact not his employer, and therefore, it is not vicariously liable for Dr. Marsh's actions or inactions to the extent his conduct violated Plaintiff's rights. (Def. Essentia's Mem., [Docket No. 110], at pp. 7-19).

The Court will first address Plaintiff's claims under 42 U.S.C. §§ 1983 and 1981 and Titles II and III of the ADA.

### A. Plaintiff's Federal Law Claims

#### i. Plaintiff's § 1983 Claims

Section 1983 makes liable any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" subjects any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, "a plaintiff must allege sufficient facts to show '(1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right.'" Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

"Only a state actor can face § 1983 liability" for acting under color of state law. Doe v. N. Homes, Inc., 11 F.4th 633, 637 (8th Cir. 2021). However, "in a few limited circumstances, a private entity can qualify as a state actor." Id. (quotations omitted). Whether a private entity commits state action is a "'necessarily fact-bound inquiry.'" Id. (quoting Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 939 (1982)).

To assess state action, this Court answers two questions. First, "whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority." Wickersham v. City of Columbia, 481 F.3d 591, 597 (8th Cir. 2007) (quotations omitted); see also Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc., 509 F.3d 406,

9

422 (8th Cir. 2007) (assessing first element).  Second, "whether the party engaging in the deprivation may be appropriately characterized as a state actor." Wickersham, 481 F.3d at 597 (quotations omitted); see generally Lugar, 457 U.S. at 937-39 (establishing and explaining test). This may occur in a few circumstances, including when (1) "'the private entity performs a traditional, exclusive public function,'" or (2) "'the government acts jointly with the private entity.'" Doe, 11 F.4th at 637 (quoting Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928, (2019)).

"Our ultimate conclusion must turn on the particular facts of the case, since only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Doe, 11 F.4th at 637 (quoting Wickersham, 481 F.3d at 597). "The one unyielding requirement is that there be a close nexus not merely between the state and the private party, but between the state and the alleged deprivation itself." Wickersham, 481 F.3d at 597 (quotations omitted). "No such nexus exists where a private party acts with the mere approval or acquiescence of the state." Id.

Here, because Dr. Marsh does not dispute an incarcerated or civilly committed person's right to adequate medical care under the Due Process Clause of the Eighth and Fourteenth Amendments, (Def. Marsh's Mem., [Docket No. 102], at pp. 17-18), the Court turns to the second state-actor question: whether Dr. Marsh "may be appropriately characterized as a state actor." Wickersham, 481 F.3d at 597.  This characterization is appropriate where an otherwise private actor "perform[ed] a traditional, exclusive public function." Doe, 11 F.4th at 637.  This may occur "when the government has outsourced one of its constitutional obligations to a private entity." Manhattan Cmty., 139 S. Ct. at 1929 n.1.

10

Privately employed medical professionals may be considered state actors for purposes of a plaintiff's constitutional claims against them if they are under contract with a state prison to provide medical care to prisoners. West v. Atkins, 487 U.S. 42, 49-50, 54-57 (1988)). Specifically, the Supreme Court held in West v. Atkins that a doctor who practiced privately, and who contracted with North Carolina to provide medical treatment to prisoners in a state prison, was a state actor when treating prisoners. West, 487 U.S. at 57. Because "the State was constitutionally obligated to provide medical treatment to injured inmates," West held that "the delegation of that traditionally exclusive public function to a private physician gave rise to a finding of state action." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 55 (1999); see also Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 826 (7th Cir. 2009) (stating West applied the public function test). Thus, the Supreme Court has characterized West as one example in which "a private entity" was "deemed a state actor" because the government "outsourced one of its constitutional obligations"—the duty "to provide medical care to prison inmates." Manhattan Cmty., 139 S. Ct. at 1929 n.1.

This case is distinguishable from West, however. Plaintiff has not shown that Dr. Marsh was under contract to provide medical care to civilly committed patients within the MSOP or that he was acting under "compulsion from the State" in choosing not to perform a penile implant procedure on Plaintiff.

Instead, the Court finds that this case is more like Griffis v. Medford, 2007 WL 2752373, at *6 (W.D. Ark. Sept. 20, 2007). Applying the Eighth Circuit's "functional view of state action," Griffis held that a "private physician treating an inmate at a private facility utilizing his independent medical judgment is not answerable to the state and does not act under color of state law for purposes of § 1983." Griffis, 2007 WL 2752373, at *6 (W.D. Ark. Sept. 20, 2007)

11

(citations omitted). There were simply "too few connections between the state and the defendants. Defendants had no contractual relationship with the state, no state doctor referred plaintiff to the facility, and there was no proof of an ongoing relationship between defendants and the jail." Id.

Here, there is similarly no proof of a contract and no proof of an ongoing relationship between the MSOP and Dr. Marsh. Instead, it appears only that those civilly committed patients within the MSOP, such as Plaintiff, were taken to medical facilities, like Essentia Health Moose Lake Clinic, on an as-needed basis for medical treatment not otherwise available within the MSOP, and the doctors and health care professionals who treated Plaintiff, like Dr. Marsh, did so in a private facility and exercised independent medical judgment. There is simply nothing in the record to suggest that Dr. Marsh acted in concert with state officials, or that his conduct is otherwise chargeable to the state. See Montano v. Hedgepeth, 120 F.3d 844, 848 (8th Cir. 1997). Indeed, Plaintiff's deposition testimony and medical records indicate Dr. Marsh unilaterally chose not to perform the penile implant procedure on Plaintiff due to his sex offender conviction status with no indication that he was directed or was consulted by MSOP medical providers in reaching this medical decision.

Therefore, Dr. Marsh's actions or inactions are not fairly attributable to the State, and he should be granted summary judgment on Plaintiff's § 1983 deliberate indifference and equal protection claims against him. See Stevens v. Braniff Airways, Inc., 490 F. Supp. 231, 233 (D. Minn. 1980) ("Where a claim is presented under the Fourteenth Amendment, it is well established that plaintiff must show that state action is involved."); Luther v. Am. Nat. Bank of Minnesota, No. 12-cv-1085 (MJD/LIB), 2012 WL 5471123, at *4 (D. Minn. Oct. 11, 2012).

To the extent Plaintiff seeks to hold Defendant Essentia Health vicariously liable under § 1983 for Defendant Marsh's constitutional torts, he cannot. First, *respondeat superior* only

imposes vicarious liability where an actor is personally liable for a tort. Leaon v. Washington Cty., 397 N.W.2d 867, 874 (Minn. 1986). Second, Defendant Essentia Health is not Defendant Marsh's employer. (Olson Decl., [Docket No. 112] at ¶ 4). There is no evidence that Defendant Marsh was under the control of Defendant Essentia when he chose not to perform the procedure at issue, and Plaintiff has cited no authority and the Court has found no such authority that, on facts such as these, Defendant Essentia can be vicariously liable for the actions of treating providers utilizing its facilities. Lastly, even if Defendant Marsh was held liable under § 1983, as a matter of law, a private employer may not be vicariously liable under § 1983. See Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993) (applying Monell to private employer); see also S.J.S. by L.S. v. Faribault Cty., 556 N.W.2d 563, 566 (Minn. Ct. App. 1996) (applying vicarious prosecutorial immunity to a county).

Therefore, summary judgment should be **GRANTED** on Plaintiff's § 1983 claims in favor of both Defendant Dr. Marsh and Defendant Essentia Health.

### ii. Plaintiff's § 1981 Claim

Defendants argue that Plaintiff's § 1981 claim fails because he cannot show a prima facie case of racial discrimination. The Court agrees. The statute provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . .". 42 U.S.C. § 1981(a). "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." St. Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987). Section 1981 does not cover other forms of discrimination. See, e.g., Anooya v. Hilton Hotels Corp., 733 F.2d 48, 50 (7th Cir.1984) ("section 1981 does not protect against discrimination based on sex or religion or age").

Here, plaintiff has only alleged facts related to discrimination on the basis of his convicted sex offender status. Plaintiff has not provided any evidence whatsoever, admissible or otherwise, which demonstrates in any way that Dr. Marsh's decision to not perform the penile implant procedure on Plaintiff was based on racial discrimination or that civilly committed sex offenders are even a protected class for § 1981 purposes.

As such, no genuine issue of material fact exists and summary judgment on Plaintiff's § 1981 claim as asserted against Defendant Marsh should be **GRANTED** to Dr. Marsh.[2]

### iii. Plaintiff's ADA Claims

Defendants next argue that Plaintiff's ADA claims under Title II and Title III fail because there is no evidence Plaintiff is sufficiently qualified as an individual with a disability under either Title. The Court also agrees here as well.

Title II of the ADA provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Thus, "[t]o establish a violation of Title II of the ADA, [a plaintiff] must demonstrate: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of. . . services, programs, or activities, or was otherwise subjected to discrimination . . . ; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." Baribeau v. City of Minneapolis, 596 F.3d 465, 484 (8th Cir. 2010) (citing Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998)). Similarly, Title

---

[2] To the extent Plaintiff seeks to hold Defendant Essentia Health vicariously liable under 42 U.S.C § 1981 as Defendant Marsh's employer, as already discussed above, Defendant Marsh is not employed by Defendant Essentia Health, but by The Duluth Clinic, Ltd. Even if Defendant Essentia Health was Defendant Marsh's employer, the Court has held that Defendant Marsh's actions did not violate § 1981, therefore, Defendant Essentia Health cannot be vicariously liable for any such violation under the statute. Therefore, summary judgment on Plaintiff's § 1981 claim asserted against Defendant Essentia Health based on vicarious liability should be **GRANTED** to Defendant Essentia Health.

III of the ADA prohibits discrimination or the denial of "full and equal enjoyment" of goods, services, and other benefits provided by "places of public accommodation" operated by entities other than public entities. Klingler, 433 F.3d at 1080. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In the present case, Plaintiff has presented no evidence whatsoever that would tend to demonstrate even the first element of such a claim: that he is a qualified individual with a disability. In other words, while Plaintiff asserts that he is disabled because of erectile dysfunction, he has offered no indication as to how this alleged disorder rendered him disabled for purposes of the ADA. Therefore, Defendant Dr. Marsh is entitled to summary judgment on Plaintiff's claims of relief under Titles II and III of the ADA.[3]

For the reasons stated forth above, the Court recommends granting both Defendants' Motions for Summary Judgment, [Docket Nos. 100, 108], as to all of Plaintiff's Federal law claims.

B. Plaintiff's State Law Claims

Having resolved Plaintiff's federal claims, the Court will now address Plaintiff's Minnesota-state law claims under the Rehabilitation Act, the Minnesota Health Records Act, and Minn. Stat. § 541.076.1. However, because all of Plaintiff's Federal law claims should be

---

[3] Similar to the Court's recommendation as to Plaintiff's § 1981 claim, summary judgment on Plaintiff's ADA claims against Defendant Essentia Health based on vicarious liability should be **GRANTED**. Defendant Essentia Health is not Defendant Marsh's employer and there is simply no evidence that Defendant Marsh was under the control of Defendant Essentia when he chose not to perform the procedure at issue. In any event, Defendant Marsh's actions did not violate the ADA, therefore, Defendant Essentia Health cannot be derivatively liable for any such violation under the ADA.

dismissed, this Court recommends that the Court decline to exercise supplemental jurisdiction over his state law claims and dismiss them as well.

Pursuant to 28 U.S.C. § 1367, where a federal court has original jurisdiction, it also has supplemental jurisdiction over "all other claims so related to the claims in the original jurisdiction that they form part of the same case or controversy." Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000). In relevant part, 28 U.S.C. § 1367(a) provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). However, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see also Porter v. Williams, 436 F.3d 917, 920 (8th Cir. 2006) (holding that a trial court may sua sponte decline supplemental jurisdiction based on § 1367(c)(3)). The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); see also Missouri Roundtable for Life v. Carnahan, 676 F.3d 665, 678 (8th Cir. 2012). The Eighth Circuit has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible." Gregoire, 236 F.3d at 420 (quoting Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990)). And "'[w]here, as here, resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction.'" Glorvigen v. Cirrus Design Corp., 581 F.3d 737, 749 (8th Cir. 2009) (quoting Farris v. Exotic Rubber and Plastics of Minn., Inc., 165 F. Supp. 2d 916, 919 (D. Minn.

16

2001)); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

The Court has considered the factors relevant to the discretionary decision of whether to exercise supplemental jurisdiction. However, these considerations do not require a court to exercise supplemental jurisdiction where no federal claims remain. See Willman v. Heartland Hosp. East, 34 F.3d 605, 613 (8th Cir. 1994) ("[W]e have upheld the refusal to exercise jurisdiction over a state-law claim even though the federal claims were disposed of late in the proceedings and the court had already devoted significant judicial resources to the state claim.") (citation omitted).

Therefore, the Court recommends declining to exercise supplemental jurisdiction over the Minnesota state-law claims under the Rehabilitation Act, the Minnesota Health Records Act, and Minn. Stat. § 541.076.1 against Defendants.

## IV. Conclusion

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED**:

1. Defendant Dr. Benjamin Marsh's Motion for Summary Judgment, [Docket No. 100], be **GRANTED**;

2. Defendant Essentia Health Moose Lake Clinic's Motion for Summary Judgment, [Docket No. 108], be **GRANTED**;

3. Plaintiff's 42 U.S.C. § 1983 claims against Defendants be **DISMISSED with prejudice**;

4. Plaintiff's 42 U.S.C. § 1981 claim against Defendants be **DISMISSED with prejudice**;

5. Plaintiff's claims under Title II and Title III of the American with Disabilities Act against Defendants be **DISMISSED with prejudice**;

6. Plaintiff's vicarious liability claim against Defendant Essentia Health Moose Lake Clinic based on Defendant Marsh's alleged Federal law violations be **DISMISSED with prejudice**; and

7. Plaintiff's Minnesota state-law claims under the Rehabilitation Act, the Minnesota Health Records Act, and Minn. Stat. § 541.076.1 against Defendants be **DISMISSED without prejudice**.

Dated: July 27, 2023

s/Leo I. Brisbois
Hon. Leo I. Brisbois
United States Magistrate Judge

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).